UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————-----x
FARMLAND FRESH DAIRIES, LLC,              :
                                          :      Civil Action No.: 15-cv-4500
                    Plaintiff,            :
                                          :      COMPLAINT FOR INJUNCTVE
              v.                          :      RELIEF AND DAMAGES AND JURY
                                          :      DEMAND
FARMERS CHOICE LLC, and                   :
SUNNYDALE FARMS, LLC,                     :
                                          :
                    Defendants.           :
————————————————————-----x

Plaintiff Farmland Fresh Dairies, LLC, for its Complaint against Defendants Farmers

Choice LLC, and Sunnydale Farms, LLC, respectfully alleges as follows:

## INTRODUCTION

1.      This is an action for preliminary and permanent injunctive relief, a product recall,

damages, and attorneys' fees for Defendants'; (i) false designation of origin of goods, (i)

trademark, and trade dress infringement in violation of Section 43(a) of the Lanham Act, 15

U.S.C. § 1125, (iii) dilution of trade dress and trademark under New York law, (iv) unfair

competition under New York law, and (v) violations of the Sherman and Donnelly Acts.

2.      Plaintiff Farmland Fresh Dairies, LLC ("FARMLAND") is the successor in

interest to the intellectual property and distribution routes of  Farmland Dairies, LLC which has

distributed milk products in the New York, New Jersey and Southern Connecticut areas since

1914.  In or about 1990,  Farmland Dairies radically departed from the traditional packaging of

milk products, and created a multi-color label including a cow spot motif.  Farmland Dairies also

departed from the traditional cap and primary label color scheme used in the milk industry.

Adopting this unconventional color scheme and cow spot motif was viewed as radical at the

time.  Over the next twenty five years, Farmland Dairies spent millions of dollars in advertising which included its new trade dress.  The Farmland Dairies' trade dress is now synonymous with Farmland's  products.  In 2014, Plaintiff Farmland Fresh Dairies, LLC purchased many of the assets of Farmland Dairies, including its intellectual property by assignment, good will and continued the tradition of distributing Farmland milk under its well-known trade-dress.

3.     Defendants ae in the business of marketing, distributing and selling fluid milk in the same markets Plaintiff distributes its products, in packaging virtually identical to the packaging of Plaintiff's "best in class" fluid milk.  In addition to copying Plaintiff's trade dress, Defendants have used, and continue to use, confusingly similar trademarks to Plaintiff's registered trademarks.  As a result of the similarities in packaging and trademarks, consumers will inevitably confuse Defendants' products for Plaintiff's.  As such, Defendants have violated Plaintiff's rights under the Lanham Act and New York statutory and common law.

4.     This was a calculated and coordinated plan by Defendants who were intimately familiar with the good-will associated with Plaintiff's brand and trade dress.  The owners of Defendant FARMERS (Elvis Echevaria and Mohammad Abdallah) previously worked for RAZ Dairy, Inc., which was a milk distributor that exclusively supplied Farmland Dairies milk pursuant to a Dairy Products Supply Agreement.  Echevaria and M. Abdullah left RAZ, taking with them RAZ's customer lists, accounts receivable, retail and wholesale customer routes, vehicles, machinery, and equipment.

5.     In February of 2014,  Farmland Dairies obtained a judgment against RAZ for $10,658,769, and a final judgment against the principal on June 4, 2014.  The judgments were entered in New York on February 10, 2015, which resolved all of the issues in that matter.  Immediately following the 2014 judgment, SUNNYDALE, through Amad Abdullah and his

brother Mohammad Abdullah, began distributing milk products co-opting Plaintiff's trade dress as well as Plaintiff's newly registered trademark cow-head logo.

6. Immediately following the February 2015 judgment, Echevaria and M. Abdullah, through FARMERS, began distributing milk with the express intention of passing off their product as Plaintiff's. In fact, the sales personnel for FARMERS told retailers that FARMERS' products were still being supplied by FARMLAND.

7. Defendants' acts were at all times knowing and with the intent to trade on Plaintiff's good-will. The potential damage to Plaintiff is far more than the economic damage an inferior, cheaper product in the same market will likely bring. Plaintiff will lose its ability to control its brand, and the trust Farmland and Farmland Dairies earned with the public over the last 100 years.

8. For example, Plaintiff goes to extraordinary lengths to protect the Farmland Dairies brand it purchased in 2014. FARMLAND is the industry leader in supply chain management and food safety protocols. FARMLAND is the only local provider of fluid milk that controls the temperature of the product from receipt to delivery to the local store – "dock to delivery". FARMLAND controls the temperature at the dock and in the warehouse and voluntarily engages a third-party company to perform unannounced audits on each of its facilities. FARMLAND also owns its delivery trucks, and monitors the temperature in every truck at all times. Any deviation in the acceptable temperature range is caught and remedied.

9. Defendants do not remotely adhere to FARMLAND's meticulous control over the supply chain, nor do they incur the costs associated with it. This allows Defendants to bring a significantly cheaper product to market, with a significantly greater chance of spoilage and possible bacterial contamination. Defendants' conduct, and the confusion with Plaintiff's brand,

runs a significant risk of damaging a century of trust overnight.  Plaintiff is entitled to injunctive

relief, a product recall and damages.

## JURISDICTON AND VENUE

10.     This Court has original jurisdiction over the subject matter of this action pursuant

to I5 U.S.C. § II2I and 28 U.S.C. §§ I33I and I338 and has supplemental jurisdiction pursuant to

28 U.S.C. § I367(a).

11.     This Court has personal jurisdiction over Defendant SUNNYDALE pursuant to

N.Y. Civ. Prac. L. & R. § 302(a).  Defendant SUNNYDALE regularly solicits and transacts

business in the State of New York and in this District through its distribution and sale of milk

products.  In addition, through its imminent activities, Defendant will wrongfully cause injury to

FARMLAND in the State of New York and in this District, such injury being reasonably

foreseeable.

12.     Defendant FARMERS is a limited liability company formed and existing under

the laws of the State of New York, with a principal place of business in the Bronx, New York.

This Court has personal jurisdiction over Defendant FARMERS pursuant to N.Y. Civ. Prac. L. &

R. § 302(a).  Defendant FARMERS regularly solicits and transacts business in the State of New

York and in this District through its distribution and sale of milk products.  In addition, through

its imminent activities, Defendant FARMERS will wrongfully cause injury to FARMLAND in

the State of New York and in this District, such injury being reasonably foreseeable.

13.     Venue is proper in this District pursuant to 28 U.S.C. § I391(b) because Plaintiff

and defendant FARMERS reside in this District under 28 U.S.C. § I391(c), and because

Defendants conduct business in this District and maintain distribution centers in this District.

## PARTIES

14.     Plaintiff Farmland Fresh Dairies, LLC ("FARMLAND") is a New Jersey limited liability company with a place of business in Queens, New York.  FARMLAND is a wholesale distributer of fluid milk and dairy products to the New York, New Jersey and Southern Connecticut markets.

15.     Upon information and belief, defendant Sunnydale Farms, LLC ("SUNNYDALE") is a New Jersey limited liability company with a principal place of business in Patterson, New Jersey.  SUNNYDALE is a wholesale distributer of fluid milk and dairy products to the New York and New Jersey markets.  SUNNYDALE maintains a distribution center in Brooklyn, New York and is owned by Amad Abdullah and Mohammad F. Abdullah.

16.     Upon information and belief, defendant Farmers Choice LLC ("FARMERS") is a New York limited liability company with a principal place of business located in the Bronx, New York.  FARMERS is an active trucking carrier operating under USDOT Number 2563724 engaged in the wholesale distribution of fluid milk and dairy products to the New York and New Jersey markets.  FARMERS is owned by Mohammad F. Abdullah and Elvis Echeveria.

## Milk Industry

17.     Due to the fact, among others, that the primary consumer of milk is children, it stands as a unique commodity in the marketplace

18.     Milk is picked up at various farms, most often by tank truck, every day, and is moved to a bottling plant for further processing and manufacturing.

19.     Every step of the way, the milk must be handled under strict temperature parameters and sanitary conditions to guard against bacterial contamination and either marketed promptly as fluid milk or processed into storable manufactured products.

20.     Two grades of milk have been identified: "Grade A" and "Grade B".  The grade depends on the milk meeting certain health (sanitary) standards.  Sanitary standards, some of which might also be called "quality standards," include the somatic cell count and bacterial count and the conditions of farm facilities, including the milking parlor, milk storage tank, and water well.

21.     "Grade A" milk meets the sanitary standards for use in fluid milk products and can be used for any dairy product.  "Grade B', or manufacturing grade, milk meets slightly lower standards and can be used only for manufactured dairy products.

**Plaintiff's Trade Dress**

22.     FARMLAND distributes not just "Grade A" milk, but "Grade A" milk of a higher quality standard than any other fluid milk on the market.  To accomplish this, FARMLAND partners with hand selected dairy farms and processors, and requires strict temperature and sanitary standards at both.

23.     Founded in 1914, Farmland Dairies became the dominate milk processor and distributer in the tristate area.  In 1990, after losing market share in the 1980s due to increased competition, Farmland Dairies adopted its now signature trade dress.  The trade dress consists of the following elements: (i) a five-color label, (ii) cow spot motif, (iii) unique cap and primary color scheme which deviated from industry standards, and (iv) trade name.  After Plaintiff purchased the valuable trade dress, it added the additional element of its registered trademark cow-head logo.  These elements constitute Plaintiff's "COW SPOT TRADE DRESS" or "FARMLAND Trade Dress".

24.     As depicted below, Plaintiff, distributes milk products with the COW SPOT TRADE DRESS which is immediately identifiable by any milk consumer in the markets serviced by FARMLAND.



25.     Farmland Dairies originally adopted its unique COW SPOT TRADE DRESS to distinguish itself, and identify its products, which at all times, were of the highest quality and subject to the most stringent handling, shipping, and sanitary protocols in the industry.  The unconventional color scheme, pictorial elements, labeling and layout of the Farmland  package contribute to an overall appearance that is highly distinctive in the industry, and unique in the markets serviced by FARMLAND.

26.     Plaintiff's COW SPOT TRADE DRESS was seen as a radical change in the milk industry at that time, which was dominated by two-color packaging.  Over the next twenty-five years, Farmland Dairies became synonymous with its COW SPOT TRADE DRESS, spending millions of dollars on brand recognition.

27.     While other milk distributers in other markets adopted elements of the COW SPOT TRADE DRESS, for the last twenty five years Farmland Dairies and now FARMLAND have had exclusive use of the trade dress.

28.     Plaintiff's trade dress is inherently distinctive in that it serves to identify the source of Plaintiff's product.  When a consumer n the New York, New Jersey or Connecticut

markets sees the COW SPOT TRADE DRESS, that consumer will immediately associate that product with Plaintiff.

29.     The success of FARMLAND stems not only from the high quality of its products, but also from the distinctive COW SPOT TRADE DRESS.  Indeed, Plaintiff's trade dress is among the most significant ways in which consumers identify the brand on shelves, and is thus among FARMLAND's most valuable intellectual property.  Plaintiff, in fact, entered into the transaction with  Farmland Dairies for the primary reason of obtaining the iconic COW SPOT TRADE DRESS.

**Advertising and Marketing**

30.     Plaintiff, and Farmland Dairies have expended considerable resources advertising and promoting its products using the distinctive COW SPOT TRADE DRESS.  The trade dress is featured prominently in advertisements, on Plaintiff's  website, in marketing programs, and in point-of-sale promotional materials.  The trade dress is even featured on a FARMLAND toy truck sold by CVS Pharmacy throughout the country.



31.     Farmland Dairies was the dominant milk distributer in the market for decades, and FARMLAND currently sells in excess of $20,000,000 in fluid milk per year.

32.     Plaintiff is the owner, by assignment, of Registered Trademark No. 3274456 for the words "FARMLAND DAIRIES" which has been used in commerce since at least 1960.  Said assignment has been duly recorded with the United States Patent and Trademark Office ("PTO").

33.     Plaintiff is the owner of Registered Trademark No. 4742827  for the stylized word mark:



34.     Plaintiff has affixed the "Farmland Fresh Dairies" mark to its product since 2014. No claim is made for the words "Fresh Dairies."  This mark claims its first use in another form at least as early as 1960.

35.     Plaintiff is the owner of  Registered Trademark No. 2132748 for its cow logo, which has been affixed to its products since. 2014:



**Defendants Prior Dealings with Farmland, Trademark and Trade Dress Infringement**

36.     Defendants share a common ownership, and are, in fact, owned and operated by brothers Ahmad Abdullah and Mohammad Abdullah.

37.     Defendant FARMERS owners, Elvis Echevaria and Mohammed Abdallah, were former employees of RAZ, who terminated their employment with RAZ in or about September 2011.

38.     RAZ Dairy, Inc. and Metro Dairy Corp. (collectively "RAZ") supplied Farmland Dairy products to a panoply of small and medium sized customers in the New York Metropolitan area.  In that capacity, RAZ served as an indispensable component of Farmland Dairies distribution network, providing Farmland Dairies with invaluable access and exposure to critical markets.

39.     RAZ's customer base consisted primarily of mid-size supermarkets and smaller retail outlets, including "mom and pop shops' and "comer stores."

40.     Given the significance of RAZ's and Farmland Dairies business relationship, on or about December 18, 2008, Farmland Dairies and RAZ entered into a Dairy Products Supply Agreement (the "Supply Agreement') (A true and accurate copy of the Supply Agreement is annexed hereto as Exhibit A).

41.     Pursuant to the terms of the Supply Agreement, RAZ agreed to, among other things, purchase all its requirements of a host of products from Farmland Dairies.

42.     The initial term of the Supply Agreement runs from December 18, 2008 through December 17, 2013, and was to be automatically renewed for an additional five (5) year term absent one hundred eighty (180) days written termination notice from either party. (See Supply Agreement, l (a)).

43.     Notwithstanding RAZ's clear and unequivocal obligation to purchase all of its milk from Farmland Dairies, and RAZ began selling milk purchased from other suppliers in blatant disregard of Farmland Dairies' rights under the parties' agreement, and transferred all of its assets which were subject to Farmland Dairies perfected security interest.

44.     During their employment with RAZ, Echevaria and M. Abdallah had access to, and, upon information and belief, misappropriated, RAZ's customer lists, accounts receivables, retail and wholesale customer routes, vehicles, machinery, and equipment.

45.     Echevaria and Mohammad Abdallah formed FARMERS on or about December 13, 2011 along with Ahmad Abdullah.

46.     Echevaria and M. Abdallah, through FARMERS, began distributing milk to mid-size supermarkets and smaller retail outlets, including "mom and pop shops' and "comer stores."

47.     FARMLAND obtained a judgment against RAZ in February of 2014, its principal in June of 2014 and those judgments were entered in New York State by Court order on February 10, 2015, effectively ending the claims in that matter.

48.     Almost immediately after the entry of the February 2015 judgment, FARMERS began distributing milk products with strikingly similar packaging as Plaintiff's products.

49.     As pictured below, Defendant FARMERS' products adopted Plaintiff's cow spot motif and unique color scheme, which identically mimic the look and feel of Plaintiff's packaging.



50.     Defendant FARMERS also elected to sell its products under a confusingly similar trade name.

51.     Plaintiff's registered trademark 'Farmland Fresh Dairies" consists of the word "Farmland", above which appears an image of a rising sun, and below which appears a star, followed by the words "Fresh Dairies", followed by another star.

52.     All packaging distributed by FARMERS contains a trademark with the word "Farmers" over which appears the word "Fresh" and a rising sun followed by the words "Choice Dairy".  Defendant FARMERS' trademark appears on all packaging in the identical place and manner as Plaintiff's trademark appears on its products.  Defendant FARMERS' trademark is also in a strikingly similar font and font size to Plaintiff's trademark.




53.     Defendant FARMERS' sales staff also contributed to the confusion, telling store owners that Defendant FARMERS' milk was being supplied by FARMLAND.

54.     Brian Smith, a salesman for FARMLAND, was informed by the manager of two Key Food supermarkets in Queens that the salesman for defendant FARMERS told the owner the similarity in packaging is because FARMLAND supplies milk to FARMERS.  This obvious and deliberate misrepresentation was calculated to pass-off Defendant FARMERS' products as Plaintiff's products.

55.     Almost immediately after the February 2014 judgment against RAZ, Defendant SUNNYDALE, through Amad Abdullah and Mohammad Abdullah, began distributing, marketing, and selling milk products in the New York and New Jersey markets utilizing

Plaintiff's COW SPOT TRADE DRESS, and Plaintiff's registered trademarked cow-head logo.



56.     As is readily apparent from the preceding label, SUNNYDALE's inclusion of a

nearly identical logo to Plaintiff's Registered Trademark No. 2132748 cow-head logo is the

clearest sign of the intent to duplicate Plaintiff's trade dress.

57.     After numerous attempts to resolve this dispute, Defendant SUNNYDALE agreed

to discontinue use of Plaintiff's logo.  Defendant SUNNYDALE, however, continued to use

Plaintiff's signature cow spot motif, and unique color scheme, and merely substituted a different

cow logo.



58.     Attached as Exhibit B is a comparison of each of Defendants' gallon and half

gallon labels with Plaintiff's label.  Defendant SUNNYDALE does not have a full line of milk

products, so only those products Plaintiff is aware of are depicted.

59.     As Exhibit B demonstrates, there was an obvious attempt by Defendants to adopt the FARMLAND trade dress.  First, Defendants adopted the unconventional color scheme used by Plaintiff for the cap and primary label color of each product.  That color scheme is as follows:

| Milk Product | Farmland | Sunnydale | Farmers Choice | Industry Standard |
|---|---|---|---|---|
| Whole | Red | Red | Red | Red |
| 2% | Purple | Purple | Purple | Blue |
| 1% | Green | N/A | Green | Pink and Purple |
| Fat Free | Royal Blue | N/A | Royal Blue | Light Blue |

60.     No milk distributor in the subject markets uses the above color scheme with the exception, of course, of Plaintiff and now Defendants.  Plaintiff's unconventional color scheme was chosen for the specific purpose of distinguishing Plaintiff's products.

61.     Both Defendants adopted the cow print motif which Plaintiff has used exclusively in the New York, New Jersey and Southern Connecticut markets for the last twenty five years, and is synonymous with Plaintiff's products.

62.     The use of cow spots and unique cap and label color scheme is completely arbitrary or fanciful.  There are an infinite number of the varieties of labels and packaging available to milk wholesalers.

63.     Defendants, however, elected to adopt an identical color scheme, and motif evocative of Plaintiff's COW SPOT TRADE DRESS.  The striking resemblance in tradenames, font style, color, and size substantially adds to the likelihood of confusion in the market.

64.     Because the size and shape of both Defendants' and Plaintiff's gallon and half gallon containers are identical, only the cap color scheme and label are distinguishing features.

65.     Defendants sold, and continue to sell, its goods in the same geographic area and market as Plaintiff sells its goods.  In fact, Defendants' products are often sold in refrigerated cases next to Plaintiff's products.

66.     Below are actual examples of the products marketed side by side.

  

67.     Defendants mimicked the style and feel of Plaintiff's label with the express intention of passing-off their milk as Plaintiff's and trading on Plaintiff's good-will and prominence in the marketplace.

68.     The confluence of similarities between the FARMLAND Trade Dress and Defendants' trade dress simply cannot be coincidence, and instead powerfully suggests a bad faith intent to trade on FARMLAND's hard-earned good will.

69.     In fact, in a phone call with Defendant SUNNYDALE's counsel in or about April of 2014, Defendant SUNNYDALE, through counsel, represented that the copying was done on the mistaken belief that Plaintiff was going out of business.

70.     Ironically, Defendants anticipated Plaintiff would not survive the damage done by the transfer of assets from RAZ, a situation which was created, in part, by Defendants. Defendant FARMERS even used the RAZ customer list to start its business; a list that rightfully belongs to Plaintiff.

71.     Defendant SUNNYDALE maintains 4 trucks, and employs approximately eight employees.  Defendant FARMERS maintains eight trucks and employs approximately twelve employees.  FARMLAND has three facilities located in Queens, N.Y., Rochester, N.Y., and Newark, N.J. and maintains 15 trucks and with 30 employees.

**Substantial and Immediate Risk of Damage to Plaintiff**

72.     Plaintiff, and its predecessor in interest Farmland Dairies, have spent the last 100 years earning the respect and trust of the public in its products.  Defendants have deprived Plaintiff of the control over its own brand.

73.     The milk industry is very special, and distributers are held to a very high standard. One misstep associated with a distributer's brand would likely erode all trust with the public permanently.

74.     Plaintiff has invested an extraordinary amount of money to ensure its product reaches the consumer without spoilage or risk of bacterial infection.

75.     Plaintiff purchased a fleet of trucks that allow Plaintiff to monitor the temperature of the milk at all times.  Reports are printed every day, from every truck, which are then analyzed by Plaintiff for any deviation from acceptable practices or temperature range.  See Exhibit C.

76.     Plaintiff is the only milk distributer in the market that controls the temperature of the product from receipt on the dock to delivery.  Temperature controlled loading and unloading facilitates and warehouse ensure the temperature of Plaintiff's products do not deviate from acceptable temperature ranges.

77.     Plaintiff also voluntarily engages a third-party auditor that provides unannounced audits of each facility Plaintiff owns, and prepares regular reports on the quality of Plaintiff's distribution system.

78.     The cost of Plaintiff's quality control protocols is substantial.  Defendants do not have the same strict standards nor do they incur the cost associated with them.  As the picture below demonstrates, FARMERS uses trailers as refrigerated "warehouses" and moves product across an unrefrigerated dock to load vehicles from its company and another company, RLB Food distributers.  This causes spikes in temperature which has a devastating impact on the milk.



79.     Defendants are able to bring an inferior, cheaper product to market with a substantial risk of spoilage and possible bacterial contamination.  Plaintiff involuntary association with Defendants' inferior product results in Plaintiff's loss of control over its brand. The threat to Plaintiff is substantial and there is no adequate remedy at law to address this threat.

**Confusion in The Market**

80.     The typical consumers of milk products are children and the average family shopper does not spend time scrutinizing the labels, but selects the product based on the look and

feel of the label associated with the product they are familiar with, and confident in the quality they have come to expect.

81.     The striking similarity between Plaintiff's packaging and the alleged infringing packaging has, and will, inevitably create confusion.  Defendants' labels mimic the look and feel of Plaintiff's label to such a degree that only a bad intent can be inferred.

82.     Plaintiff's color scheme, label and cow spot motif are renowned in the geographic area Plaintiff sells its products.

83.     Because of the risk of introducing possible bacterial contamination, consumers expect care and attention at every step in the process of getting fluid milk to the market.  This is exactly what Plaintiff, and Farmland/Farmland Dairies , have provided for the last 100 years.

84.     Defendants have used Plaintiff's trade dress for months, and actual confusion has already taken place in the market.  In fact, Defendants have affirmatively represented their product originates from Plaintiff.  This obvious and deliberate misrepresentation was calculated to pass-off Defendants' products as Plaintiff's.

85.     Plaintiff's and Defendants' goods are marketed through the exact same channels of trade and advertised through the same media.

86.     The targets of the parties' sales efforts are the same.

87.     The goods actually compete with each other, and are of the same type in the minds of the public because of the similarity of function.

88.     Defendants' intention in adopting Plaintiff's trade dress was to trade on the good-will developed by Plaintiff.

89.     Consumers viewing the Plaintiff's product would probably assume it is Plaintiff's product.

90.     Plaintiff's label and Defendants' labels create the same overall impression when viewed separately.

91.     There are innumerable modes of expression for the label on a milk container, yet Defendants elected to adopt packaging nearly identical to Plaintiff.

92.     As shown in the photographs depicted in paragraph 52 of this Complaint, in some stores, Defendants' product is being placed on the shelf immediately next to Plaintiff's.  Given the remarkable similarity in their appearance, it is inevitable that consumers will confuse Defendants' product with Plaintiff's product.

93.     Defendants can point to no functional necessity for its deliberate and willful copying of Plaintiff's trade dress.  Rather, the only purpose served by Defendants' copying of the FARMLAND packaging is to trade on the goodwill surrounding Plaintiff's brand.

94.     Defendants' mimicry of the color, layout, cow spot motif, labeling and other design elements of the FARMLAND packaging is likely to cause confusion among consumers as to the source or sponsorship of Defendant's goods.  This confusion will take the form of: (i) actual confusion as to whether Defendants' product is Plaintiff's; (ii) confusion as to the source, origin or sponsorship of Defendants' products; (iii) subliminal confusion in that the close similarity of Defendants' packaging to FARMLAND's packaging is what draws consumers' attention to Defendants' products in the first place and, accordingly, leads to the ultimate sale of Defendants' product to consumers (i.e., initial interest confusion); and/or, (iv) confusion stemming from the close similarity of Defendants' packaging to FARMLAND's packaging because when end-consumers reach for milk with a cow motif as incorporated in a unique color scheme, they are reaching for what they believe to be FARMLAND's product (i.e., post-sale confusion).

## Injury to Plaintiff and the Public

95.     Defendants' trade dress infringement and misleading positioning of milk products is causing several distinct forms of injury to FARMLAND.

96.     Of paramount importance is FARMLAND's loss of control over its brand's reputation.  Defendants' unauthorized copying of Plaintiff's trade dress causes Plaintiff's brand to be associated with a product over which it has no control.  This involuntary association could injure Plaintiff when consumers are dissatisfied with Defendants' products for any reason and consequently have a less favorable opinion of FARMLAND.

97.     Plaintiff has protested Defendants' infringement of Plaintiff's trademark and trade dress rights, but Defendants have refused to remedy its unlawful conduct.  As a result, Plaintiff is suffering, and will continue to suffer, irreparable injury for which it has no adequate remedy at law.

98.     Because Defendants do not incur the costs associated with Plaintiff's strict sanitary and temperature controls, Defendants can flood the market with cheaper, inferior quality milk, which undermines Plaintiff both economically and by reputation.

99.     Plaintiff only recently learned of the poor product handling protocols employed by Defendants including their failure to use refrigerated docks or warehouse, their use of trailers, and the poor quality of Defendants' trucks.  Each of these factors substantially increase the risk of spoliation and possible bacterial contamination.

100.     The risk of a single contamination in Defendants' products being associated with Plaintiff would undermine a century of trust Plaintiff has earned with the public.  The risk to the Plaintiff is immediate, and there is no adequate remedy at law to address the risk to Plaintiff.

## Price Fixing

101.    Defendants not only co-opted Plaintiff's Trade Dress and Marks, and misrepresented Plaintiff supplied their products; they conspired to set the price of milk.

102.    Defendants set their prices for 12-15% less than Plaintiff's products.  Defendants' deliberate confusion with retailers of the origin of their product with retailers, and the reduced product costs, erodes the potential market which Plaintiff can sell its goods.

103.    Defendants, aware of what Plaintiff charges for its product, deliberately acted in concert to undercut the market.

104.    Attached as  Exhibit D are the pricelists for FARMERS and FARMLAND. Plaintiff has been informed SUNNYDALE uses the same price list as FARMERS.

## COUNT ONE

### (Trademark Infringement under Section 43(a) of the Lanham act)

105.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

106.    Prior to the acts complained of in this complaint, Plaintiff  made extensive use its inherently distinctive registered trademarks including its logo cow-head, and marks "FARMLAND DAIRIES" and "FARMLAND FRESH DAIRIES" (collectively the 'Marks"),

107.    Plaintiff's registered mark "Farmland Fresh Dairy", U.S. Registered Trademark No. 4742827  is incredibly strong.  Plaintiff/Farmland Dairies was the dominant milk distributor in the subject markets for decades.

108.    "Farmland Fresh Dairies" and "Farmers Choice Dairy" stylized trademarks have a high degree of similarity.  Defendant simply moved the word "Fresh" from below to above the name "Farmers" and included a rising sun.

109.    FARMLAND/Farmland Dairies, has had the uncontested use of the "Farmland Dairies" word mark for at least 55 years, and the stylized "Farmland Fresh Dairies" mark since at least February 1, 2014.

110.    FARMLAND's uncontested use of the Marks have acquired secondary meaning in the marketplace.

111.    Defendant FARMERS' mark is likely to cause confusion.  Defendant FARMERS presents its mark in the same place and in the same manner as Plaintiff, using a nearly identical font and font size.

112.    Defendant FARMERS' products are marketed in the same manner, to the same markets, and, in fact, directly competes with Plaintiff's products.

113.    Defendant FARMERS has deliberately misrepresented that its products originated from Plaintiff.

114.    Defendant FARMERS' use will inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.

115.    Defendant FARMERS' use will lead consumers to be confused as to whether Plaintiff sponsors FARMERS activities, with a resulting loss of control by Plaintiff over how the public perceives Plaintiff's products in violation of 15 U.S.C. § 1125(a)(1)(A).

116.    Defendant FARMERS adopted its mark with the intention of capitalizing on Plaintiff's reputation and goodwill and any confusion between FARMERS' and Plaintiff's products.

117.    Plaintiff's reputation is jeopardized by virtue of the fact that the FARMERS does not remotely maintain Plaintiff's strict temperature control and sanitary guidelines.

118.    Milk is a relatively inexpensive item, and a trier of fact would be justified in concluding that the parties' customers are not likely to be sophisticated purchasers as to the goods in question.

119.    Defendant SUNNYDALE has included Plaintiff's registered trademark cow head on its products.

120.    Defendants' distribution, sale and promotion of its products with identical, or the very least confusingly similar, trademarks is likely to cause confusion and mistake and to deceive retailers and consumers as to the source, origin or sponsorship of these products. Consumers seeing Defendants' products in the marketplace likely will believe that they are sponsored by, associated with, or otherwise affiliated with FARMLAND or vice versa.

121.    Any confusion stemming from Defendants' confusingly similar marks would cause irreparable injury to both the sales and reputation of FARMLAND.

122.    The harm to Plaintiff resulting from Defendants' unlawful acts is irreparable, continuing and not fully compensable by monetary damages.

123.    Based on Defendants' activities, Plaintiff reasonably believe Defendants intend to continue unlawfully using Plaintiff's Marks.

124.    Defendants' unlawful acts have damaged Plaintiffs and will continue to cause damage and irreparable injury to Plaintiff unless enjoined by this Court.  As such, Plaintiff is entitled to a preliminary and permanent  injunction pursuant to 15 U.S.C. § 1116(a).

125.    Moreover, Plaintiff is also entitled to a judgment from this Court awarding Plaintiff damages equal to three times the amount of the damages it suffered as a result

of Defendants' acts or, in the alternative, statutory damages as the Court considers just, pursuant to 15 U.S.C. § 1117.

## COUNT TWO

### (Trade Dress Infringement and False Designation of Origin Under Section 43(a) of the Lanham Act)

126.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

127.    Defendants' deceptive marketing and sales practices in connection with its products in their present packaging constitutes false designation of origin and infringement of the FARMLAND Trade Dress in violation of Section 43(a) of the Lanham Act, I5 U.S.C. § 1125(a).

128.    Defendants' distribution, sale and promotion of their products is likely to cause confusion and mistake and to deceive retailers and consumers as to the source, origin or sponsorship of these products.  Consumers seeing Defendants' products in the marketplace likely will believe that they are sponsored by, associated with, or otherwise affiliated with FARMLAND or vice versa.

129.    Defendants' acts of trade dress infringement, unless restrained, will cause great and irreparable injury to FARMLAND and to the business and goodwill represented by the FARMLAND trade dress, in an amount that cannot be ascertained at this time, leaving FARMLAND with no adequate remedy at law.

130.    Defendants' use and infringement of Plaintiff's Trade Dress is willful, wanton, intentional and deliberate.

131.    The harm to Plaintiff resulting from Defendants' unlawful acts is irreparable, continuing and not fully compensable by money damages.

132.     Defendants' unlawful acts have significantly damaged Plaintiff and will continue to cause damage and irreparable injury to Plaintiff unless enjoined by the Court.

133.     Based on Defendants' activities, Plaintiff reasonably believe that Defendants intend to continue unlawfully and unfairly using Plaintiffs' trade dress.

134.     As such, Plaintiff is entitled to a preliminary and permanent injunction, pursuant to 15 U.S.C. § 1116(a), prohibiting Defendants from any and all use of Plaintiff's Trade Dress.

135.     Moreover, Plaintiff is entitled to recover from Defendants all damages that Plaintiff has sustained and will sustain as a result of such infringing acts and all gains, profits and advantages obtained by Defendants as a result thereof, in an  amount not yet  known, but which Plaintiff is  entitled  to have trebled due to Defendants' willful  infringement  or, in  the alternative, statutory damages as the Court considers just plus the costs of this action, including attorneys' fees, pursuant to 15 U.S.C. § 1117.

## COUNT THREE

### (Federal Trademark Dilution, 1 5 U.S. C. § 1125(c))

136.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

137.     As a result of the duration and extent of use of the Marks by Plaintiff, the duration and extent of the advertising and publicity of the Marks by Plaintiff, the superior quality of Plaintiff's products and the degree of recognition of Plaintiff's Marks, Plaintiff's Marks have achieved an extensive degree of distinctiveness and are famous trademarks.

138. As a result of Defendants' hijacking, copying, infringing, theft and ongoing improper commercial use of Plaintiff's Marks, Defendants have diluted and continue to dilute the distinctive quality of and reputation associated with Plaintiff's Marks.

139. Defendants' acts of trademark dilution are willful, wanton, intentional and deliberate.

140. The harm to Plaintiff resulting from Defendants' acts is irreparable, continuing and not fully compensable by money damages.

141. Based on Defendants' activities, Plaintiff reasonably believes Defendants intend to continue unlawfully using Plaintiff's illegally and unfairly obtained Marks.

142. Defendants' unlawful acts have damaged Plaintiff and will continue to cause damage and irreparable injury to Plaintiff unless enjoined by this Court. As such, Plaintiff is entitled to a preliminary and permanent injunction pursuant to 15 U.S.C. § 1 116(a).

143. Moreover, Plaintiff is also entitled to a judgment from this Court awarding Plaintiff damages equal to three times the amount of the damages it suffered as a result of Defendants' unlawful acts or, in the alternative, statutory damages as the Court considers just, pursuant to 15 U.S.C. § 1117.

## COUNT FOUR

### (Intentional Interference With Prospective Economic Advantage)

144. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

145. Plaintiff has actual and prospective business relationships with numerous third parties, including customers and clients of Defendants.

146.    Defendants' intentional unlawful acts - including impersonating, masquerading as, posing as, and/or fraudulently passing themselves off as Plaintiff in the marketplace, have interfered with Plaintiff's economic and business relationships.

147.    Defendants acted with the purpose of harming Plaintiff for the unlawful purpose of stealing Plaintiff's business, customers, identity, and intellectual property, and unfairly competing with Plaintiff.

148.    Defendants' acts of interference with Plaintiff's business relations are willful, wanton, intentional and deliberate.

149.    The harm to Plaintiff resulting from Defendants' acts is irreparable, continuing and not fully compensable by money damages.

150.    Defendants' unlawful acts have damaged Plaintiff and will continue to cause damage and irreparable injury to P1aintiff unless enjoined by this Court.  As such, Plaintiff is entitled to a preliminary and permanent injunction.

151.    Moreover, Defendants' acts have caused substantial monetary damage  to Plaintiff's business operations, trade name, Marks, reputation and good will, the exact amount to be determined at trial.

**COUNT FIVE**

**(Use of Plaintiff's Name With Intent to Deceive in Violation of
New York General Business Law § 1 33)**

152.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

153.    Defendants have wrongfully, willfully, fraudulently and unlawfully used, stolen, appropriated and infringed upon Plaintiff's name, identity, Marks, reputation, intellectual property and goodwill.

154.    Defendants' unlawful acts were done for the unlawful purpose of stealing Plaintiff's business, customers, identity, intellectual property, and unfairly competing with Plaintiff.

155.    Defendants' acts constitute use of Plaintiff's corporate and/or trade name with intent to deceive or mislead in violation of New York General Business Law § 133.

156.    Defendants' acts of using Plaintiff's name with intent to deceive or mislead are willful, wanton, intentional and deliberate.

157.    The harm to Plaintiff resulting from Defendants' acts is  irreparable, continuing and not fully compensable by money damages.

158.    Defendants' unlawful acts have damaged Plaintiff and will continue to cause damage and irreparable injury unless enjoined by this Court.  As such, Plaintiff is entitled to a preliminary and permanent injunction pursuant to New York General Business Law § 133.

159.    Moreover, Defendants' acts have also caused substantial monetary damage to Plaintiff's business operations, Trade dress, Marks, reputation and good will, the exact amount to be determined at trial.

## COUNT SIX

### (Infringement of Plaintiff's Protected Trade Name and Mark in Violation of New York General Business Law § § 360-k and 360-m)

160.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

161.    Defendants' conduct constitutes infringement of Plaintiff's Marks, and trade name under New York General Business Law § 360-k.

162.    Defendants' infringement, copying, stealing, hijacking, and unauthorized commercial use of Plaintiff's Marks and Trade Dress is likely to cause confusion, mistake and to deceive the public as to the source or origin of the purported products sold by Defendants and/or whether there is a legitimate connection between Defendants or their purported products, and Plaintiff and its products.

163.    Defendants' acts of infringement are willful, wanton, intentional and deliberate.

164.    The harm to Plaintiff resulting from Defendants' acts is irreparable. continuing and not fully compensable by money damages.

165.    Defendants' unlawful acts have damaged Plaintiff and will continue to cause damage and irreparable injury to Plaintiff unless enjoined by this Court.  As such, Plaintiff is entitled to a preliminary and permanent injunction pursuant to New York General Business Law § 360-m.

166.    Moreover, Plaintiff is entitled to a judgment from this Court awarding Plaintiff damages equal to three times the amount of the damages they suffered as a result of Defendants' acts pursuant to New York General Business Law § 360-m.

## COUNT SEVEN

### (Injury to Plaintiff's Business Reputation and Dilution in Violation of New York General Business Law § § 3 60-1and 360-m)

167.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

168.     Defendants' infringing, hijacking, copying, stealing and misappropriation of Plaintiff's Marks and Trade Dress, and unlawful commercial  use  of Plaintiff's valuable Marks and Trade Dress is likely to injure Plaintiff's business reputation and to dilute the distinctive quality of Plaintiff's Marks and Trade Dress in violation of New York General Business Law § 360-1.

169.     Defendants' unlawful use of Plaintiff's Marks and Trade Dress, and identity in connection with their sham representation that Plaintiff supplies their products which are wholly unconnected to Plaintiff and which are neither sponsored by, endorsed or affiliated with Plaintiff nor are they within Plaintiff's control; are likely to dilute the distinctive quality of Plaintiff's Marks and Trade Dress in violation of New York General Business Law § 360-1, and thus will cause significant damage and injury to Plaintiff.

170.     Defendants' injurious acts and dilution are willful, wanton, intentional and deliberate.

171.     The harm to Plaintiff resulting from Defendants' acts is irreparable, continuing and not fully compensable by money damages.

172.     Defendants' unlawful acts have damaged Plaintiff and will continue to cause damage and irreparable injury to Plaintiff unless enjoined by this Court.  As such, Plaintiff is entitled to a preliminary and permanent injunction pursuant to New York General Business Law § 360-m.

173.     Moreover, Plaintiff is entitled to a judgment from this Court awarding Plaintiff damages equal to three times the amount of the damages it suffered as a result of Defendants' acts pursuant to New York General Business Law § 360-m.

## COUNT EIGHT

**(Deceptive Business Practices, Consumer Fraud, Unfair Competition, and False Advertising in Violation of New York General Business Law §§ 349 and 350)**

174.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

175.    Defendants, by infringing, hijacking, stealing and copying Plaintiff's Marks, Trade Dress,  and identity, and unlawfully misusing the same  for commercial  purposes,  have deceived,  confused,  and  misguided  the  public  as to the source or origin of the purported products, goods sold by Defendants.

176.    There is no legitimate connection between Defendants or their purported products, and Plaintiff and its products, and Plaintiff has neither endorsed, or wishes to be affiliated with or otherwise associated with Defendant.

177.    Defendants' unlawful acts have been and continue to be misleading to the public, and others, in a material way.

178.    Defendants' acts are willful, malicious  and  constitute  deceptive  business practices, consumer fraud, false advertising and unfair  competition under New York General Business Law §§ 349 and 350.

179.    Defendants' deceptive business practices are willful, wanton, intentional and deliberate.

180.    The harm to Plaintiff resulting from Defendants' acts is irreparable, continuing and not fully compensable by money  damages.

181.    Defendants' unlawful acts have damaged Plaintiff and will continue to cause damage and  irreparable injury to Plaintiff unless enjoined by this Court.  As such, Plaintiff is

entitled to a preliminary and permanent injunction pursuant to New York General Business Law § 349(h).

182.     Moreover, Plaintiff is also entitled to a judgment from this Court awarding Plaintiff damages equal to three times the amount of the damages it suffered as a result of Defendants' acts pursuant to New York General Business Law § 349(h).

## COUNT NINE

### (Deceptive Acts and Practices Under N.Y. Gen. Bus. Law § 349)

183.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

184.     Plaintiff has standing to bring this claim pursuant to N.Y. Gen. Bus. Law § 349(h).

185.     The acts of Defendants, including misleading advertising and marketing, as described above, constitute deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349.

186.     This conduct is aimed at convincing consumers Defendants' lower quality products with significantly higher risk of spoliation and bacterial contamination are Plaintiff's.

187.     Defendants' conduct directly impacts the public health and safety. As described at length above, the risk to the public from spoliation and possible bacterial contamination is substantial.

188.     Defendants conduct is materially misleading and Plaintiff has suffered an injury as a result of the deceptive act or practice.

189.     By reason of the foregoing, FARMLAND is entitled to injunctive relief against Defendants, restraining them from any further acts of trademark and/or trade dress infringement

and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts.

## COUNT TEN

### (Unfair Competition under New York Law)

190.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

191.    The acts of Defendants acts as described above constitute unfair competition in violation of FARMLAND's rights under the New York State common law, as preserved by N.Y. Gen. Bus. Law § 360-o.

192.    By reason of the foregoing, FARMLAND is entitled to injunctive relief against Defendants, restraining them from any further acts of trademark and/or trade dress infringement and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts.

## COUNT ELEVEN

### (Violation of the Sherman Act, 15 U.S.C. § 1 et seq.)

193.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

194.    Defendants conspired to adopt Plaintiff's Marks and Trade Dress and then fix the price of milk in the market.

195.    Defendants, through Echevaria and M. Abdullah, were well aware of the prices charged by Plaintiff.

196.    Defendants set identical prices, undercutting Plaintiff.

197.     This parallel conduct in the context of family members controlling purportedly competing companies raises a suggestion of a preceding agreement to fix the price of milk.

198.     The coordinated effort by Defendants to hijack Plaintiff's Trade Dress and Marks further supports the existing of a preceding agreement to fix prices.

199.     Defendants conduct constitutes horizontal agreements among competitors to fix prices or divide market, and is deemed per se unlawful.

**200.**     By reason of the foregoing, FARMLAND is entitled to injunctive relief against Defendants, restraining them from any further acts of trademark and/or trade dress infringement and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts.

## COUNT TWELVE

### (Violation of New York's Donnelly Act, N.Y. Gen. Bus. Law §  340 et seq.)

201.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

202.     As set forth above, Defendants engaged in horizontal price fixing, which is a per se violation of the Donnelly Act.

203.     By reason of the foregoing, FARMLAND is entitled to injunctive relief against Defendants, restraining them from any further acts of trademark and/or trade dress infringement and, after trial, recovery of any damages (to the extent calculable) proven to have been caused by reason of Defendants' aforesaid acts.

## PRAYER FOR RELIEF

**WHEREFORE, FARMLAND respectfully prays:**

1. That Defendants and all those in active concert or participation with it (including, but not limited to, its officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns and contracting parties) be temporarily, preliminarily and then permanently enjoined and restrained from:

   a. manufacturing, distributing, shipping, advertising, marketing, promoting, selling or otherwise offering for sale fluid milk products in the challenged trade dress or any other trade dress that is confusingly similar to that of FARMLAND's products;

   b. representing, by any means whatsoever, that any products manufactured, distributed, advertised, offered or sold by Defendant are FARMLAND's products or vice versa, and from otherwise acting in a way likely to cause confusion, mistake or deception on the part of purchasers or consumers as to the origin or sponsorship of such products; and

   c. That Defendants and all those in active concert or participation with it (including, but not limited to, its officers, directors, agents, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns and contracting parties) take affirmative steps to dispel such false impressions that heretofore have been

created by its use of the challenged trade dress, including, but not limited to, recalling from any and all channels of distribution any and all infringing products and promotional materials.

2. That Defendants account to FARMLAND for their profits and any damages sustained by FARMLAND, to the extent calculable, arising from the foregoing acts of trade dress infringement and dilution, false designation of origin and deceptive acts and practices.

3. That, in accordance with such accounting, FARMLAND be awarded judgment for three times such profits or damages (whichever is greater), pursuant to I5 U.S.C. § 1117 and N.Y. Gen. Bus. Law § 349(h).

4. That FARMLAND have and recover its costs, including its reasonable attorneys' fees and disbursements in this action, pursuant to I5 U.S.C. § 1117 and N.Y. Gen. Bus. Law § 349(h).

5. That FARMLAND be awarded punitive damages pursuant to the law of the State of New York in view of Defendants' intentional and willful trade dress and trademark infringement and other conduct.

6. That Defendants deliver up for destruction all infringing products in its possession or control and all means of making the same in accordance with I5 U.S.C. § 1118.

7. That Defendants file with the Court and serve on counsel for FARMLAND within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to I5 U.S.C. § 1116(a) setting forth in detail the

manner and form in which Defendants have complied with any injunction which the Court may enter in this action.

8. That FARMLAND have be awarded such other and further relief as the Court may deem just and proper

**JURY TRIAL DEMAND**

FARMLAND demands a trial by jury  on all claims as to which a jury  trial may be had.

Dated: August 1, 2015
       New York, New York

                     By: _____
                         Richard M. Garbarini  (RG 5496)
                         GARBARINI FITZGERALD P.C.
                         250 Park avenue, 7th Floor
                         New York, New York 10177
                         Phone (212) 300-5358
                         Fax (888) 265-7054
                         Email: rgarbarini@garbarinilaw.com

                         Attorneys for Plaintiff